IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Terry Altman,

               Plaintiff,                                   Case No: 2:14-cv-321

        v.                                        Judge Graham

Gary Krisher, *et al.*,

               Defendants.

Opinion and Order

      Plaintiff Terry Altman brings this action under 42 U.S.C. § 1983 against defendants Dr. Gary Krisher and Nurses Rayma Jensen and Jessica McQuate in their individual capacities. Plaintiff alleges that while he was incarcerated at the Chillicothe Correctional Institution (CCI), defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment of the United States Constitution. In particular, he alleges that defendants refused to provide him with necessary medical treatment for a condition that developed into Fournier's Gangrene, an aggressive and life-threatening infection that causes gangrene to the scrotum.

      The matter is before the court on defendants' motion for summary judgment. Defendants concede that plaintiff experienced a serious medical need, but they argue that the evidence does not support an inference that they acted with deliberate indifference in treating plaintiff's symptoms.

      Also before the court is plaintiff's motion for adverse inferences relating to defendant Dr. Krisher, who suffers from amyotrophic lateral sclerosis, or Lou Gehrig's Disease. Plaintiff contends that defendants' counsel knew of Dr. Krisher's condition but failed to cooperate with discovery requests relating before his condition rendered him unable to communicate. Plaintiff argues that the proper remedy is to permit adverse inferences that Dr. Krisher would have answered all discovery-related questions in a light most favorable to plaintiff.

      For the reasons set forth below, defendants' motion for summary judgment is largely denied and plaintiff's motion for adverse inferences is denied.

I.     **Background**

A.     **April 5 and 6, 2012**

In early April 2012, 53-year-old Terry Altman began experiencing pain and burning in his groin area.  After two days of the pain getting worse, Altman filed a Health Services Request at CCI on Thursday, April 5.  In the Request form, Altman stated that his groin hurt to the point that he could barely urinate and barely walk.  He further stated, "I am swelled[.]  My balls are on fire[.]  It [is] getting wors[e].  Please see me ASAP."  (Doc. #37-4 at PAGEID 162).

Altman's form, which he had placed in a medical request box, was collected and reviewed by third-shift nurse Angel Clark at 1:00 a.m. on Friday, April 6, 2012.  She passed the form onto Nurse Katie Richardson for her to call the officer in the dorm where Altman was housed because "it looked like he would need some care and he may want to be seen immediately."  (Richardson Dep. at 79).  Richardson made the call at 1:10 a.m. and asked the officer to inquire whether Altman wanted to come to the infirmary right away.  Richardson was told that Altman did not want to come, and she noted on the Request form, "Denies need to come to medical at this time."  (Doc. #37-4 at PAGEID 162).  Richardson put Altman on "nurse's sick call" so that he would by seen be a nurse at the infirmary later that day.  (Richardson Dep. at 79).

In the declaration submitted by Altman, he does not directly address Richardson's statement that he denied the opportunity to come to the infirmary at 1:10 a.m.  He does, however, state, "I came [to the infirmary] as soon as I was allowed to because I needed medical assistance at the first possible opportunity.  I never denied having medical needs or needing emergency care.  I wanted to be seen right away by a doctor."  (Altman Decl. at ¶ 6).

Altman was seen at the infirmary by defendant Nurse Rayma Jensen at 7:40 p.m. on April 6.  The record contains no indication why Altman was not seen earlier in the day, other than Nurse Jensen's testimony that Health Services Requests "get triaged by an RN, and then they will be seen within 48 business hours.  (Jensen Dep. at 20).  Altman states that the "infirmary told me when to come in on April 6."  (Altman Decl. at ¶ 6).  Defendant Dr. Gary Krisher, former Chief Medical Officer at CCI, generally kept regular business hours at CCI from Monday to Friday.  (McQuate Dep. at 13).  But the record contains no evidence about whether Dr. Krisher had been at CCI on April 6.  Dr. Krisher was available as an on-call doctor outside of regular business hours and over the weekend.  (Jensen Dep. at 29-30).

Prior to seeing Altman, Nurse Jensen got a "phone call stating that Mr. Altman was having urinary problems."  (Jensen Dep. at 41).  She commonly reviews a patient's medical record before

seeing the patient, but she was not specifically asked during her deposition whether she reviewed Altman's records on April 6. (Id. at 37-38).

Altman had difficulty walking from his dorm to the infirmary because he was in pain. (Altman Decl. at ¶ 7). According to Nurse Jensen's assessment form, Altman complained of nausea, weakness, constipation, lack of appetite, and "barely drizzling" when urinating for the past three or four days. (Doc. #37-4 at PAGEID 163). In the "Objective Data" section of the assessment form, Nurse Jensen recorded Altman's temperature, pulse, blood pressure and weight, but she wrote "deferred" in the line pertaining to a genital exam. (Id.) She said that Altman did not complain of any genital pain or swelling and that "he was complaining of urinary issues, not being able to urinate." (Jensen Dep. at 41). Jensen performed a urine dipstick test, which showed "some white blood cells." (Id. at 42). This result caused her to believe that Altman perhaps had a urinary tract infection. (Id. at 42) ("So I'm thinking . . . of a UTI or urinary tract infection, but as a nurse I cannot diagnose."). Jensen did not visualize or exam Altman's scrotum. (Id. at 42-43) ("If he would have complained of [scrotal] pain or edema, I would have visualized it.").

According to Altman, he did tell Nurse Jensen about the pain and swelling in his scrotum or testicles. He states that he told her "about the terrible pain and swelling in my testicles. I told her about everything in my health services request. I made sure to emphasize that the swelling was bad and that my testicles felt like they were burning." (Altman Decl. at ¶ 7). Altman agrees that Nurse Jensen did not examine his scrotum but did perform a urine test. (Id. at ¶ 8).

Nurse Jensen phoned Dr. Krisher and told him about her assessment of Altman and the results of the urine dipstick test. (Jensen Dep. at 43-44). Dr. Krisher believed that Altman had a urinary tract infection and prescribed 500 milligrams of Cipro, an oral antibiotic, twice a day for five days. (Doc. #37-4 at PAGEID 166). He also ordered that Altman receive a saline IV drip at the infirmary before he was sent back to the dorm. (Id.) Nurse Jensen believed that the purpose of the IV drip was to "flush the system out" and "help hydrate." (Jensen Dep. at 44). Dr. Krisher ordered that a nurse call him if Altman's condition did not improve. (Doc. #37-4 at PAGEID 166). Altman was given his first Cipro dose at that time, and Nurse Jensen began the IV at 8:30 p.m., which was to last for two hours. (Doc. #37-4 at PAGEID 171; Jensen Dep. at 45-46). Nurse Jensen's shift ended at 10:00 p.m., while Altman was receiving the IV, and she had no further involvement in Altman's care.[1] (Jensen Dep. at 29, 45, 55-56).

---

[1] Many weeks later, Nurse Jensen did provide Altman with bandages during his post-surgery care. (Jensen Dep. at 71-72). The complaint contained allegations that defendants acted with deliberate

Nurse Clark checked on Altman at the infirmary at 11:00 p.m. on April 6. In her notes, she recorded his vital signs and wrote that his self-reported pain level had decreased from 8 out of 10 to 5 out of 10. (Doc. #37-4 at PAGEID 171). She noted also that his "scrotum swelled considerably." (Id.) Nurse Clark recalls that his scrotum was not "grossly" swollen but was at least larger than what is normal. (Clark Dep. at 33). She called Dr. Krisher and reported Altman's pain level, vitals and scrotal swelling. (Id. at 33-34).

Dr. Krisher prescribed that Altman be given a one gram dose of Rocephin, an injectable antibiotic, at that time. (Clark Dep. at 32). Dr. Krisher further instructed that Altman be released from the infirmary after receiving the Rocephin, that a nurse should check on him the next morning and that he should be called if Altman's symptoms persisted. (Doc. #37-4 at PAGEID 168, 171). Nurse Clark released Altman back to his dorm at 12:05 a.m. on April 7 and gave him a pass to see a nurse at the infirmary at 8:00 a.m. (Doc. #37-4 at PAGEID 171). She made a note for a nurse to check his scrotum when he returned to the infirmary. (Id.)

**B.    April 7**

On the morning of at Saturday April 7, Altman's pain and swelling was so great that he could barely walk. (Altman Decl. at ¶ 12). He requested that correctional officers call the infirmary to request that he be assessed at his dorm, but the officers told him that the infirmary would not send anyone. (Id.) Altman made it to the infirmary and was seen by Nurse Richardson at 8:45 a.m. Nurse Richardson took his vitals and noted that Altman "ambulates slow" and that he stated that the pain was "no better or worse than last night." (Doc. #37-4 at PAGEID 172). Richardson does not recall doing a visualization of his scrotum. (Richardson Dep. at 56). She gave him Motrin for his pain and inflammation and gave him a pass to see a doctor on Monday, April 9. (Doc. #37-4 at PAGEID 172; Richardson Dep. at 50). Richardson did not call Dr. Krisher or any other doctor. (Richardson Dep. at 62).

According to Altman, he reported to Richardson that his condition was getting worse and that he needed to see a doctor right away. (Altman Decl. at ¶ 14). He states that he was not given

---

indifference to his post-surgery medical needs. However, plaintiff has offered no opposition to the branch of defendants' motion for summary judgment which establishes that defendants had minimal involvement in his post-surgery care and did not refuse any treatment to him. (McQuate Dep. at 47-48) (testifying that she provided Altman with supplies for his catheter and urinary bags); (Higginbotham Aff. at ¶¶ 5-6) (custodian of CCI medical records stating that these records show that Dr. Krisher arranged for Altman's catheter to be changed in July 2012). This branch of defendants' motion for summary judgment is therefore granted.

4

any antibiotics that morning and returned to his dorm. (Id. at ¶ 15).  He did not get any meals or pick up his Cipro because the pain and swelling left him unable to walk.  (Id. at ¶ 16).

**C.  April 8**

On Sunday, April 8, Altman "couldn't walk or even get out of bed without help."  (Altman Decl. at ¶ 17).  His scrotal pain and swelling kept him from getting meals, and he asked a corrections office to call for a nurse to come to his dorm.  (Id. at ¶ 19).

At 9:15 p.m. on April 8, defendant Nurse Jessica McQuate examined Altman in a laundry area near his dorm.  (Doc. #37-4 at PAGEID 173; Altman Decl. at ¶ 20).  Nurse McQuate recalls being called to see him on an "urgent" basis.  (McQuate Dep. at 28).  Altman complained of testicular pain, stated that he had a pass to see a doctor the next morning and requested something to help alleviate the pain overnight.  (Id. at 28-29).  He rated his pain level at 8 out of 10.  (Doc. #37-4 at PAGEID 173).  Nurse McQuate observed swelling in his scrotum but no redness or drainage.  (McQuate Dep. at 29).  She provided him with five packets of Tylenol and advised him to rest and see the doctor the next morning.  (Id. at 45; Doc. #37-4 at PAGEID 173-74).  Nurse McQuate believed that Altman had an infection and did not call a doctor.  (McQuate Dep. at 36).

According to Altman, Nurse McQuate gave him a cursory exam lasting no more than five minutes long.  (Altman Decl. at ¶ 22).  He states that she did not give him any medicine and said that there was nothing she could do for him.  (Id. at ¶¶ 21-22).

**D.  April 9**

On Monday, April 9, Altman's pain level was 10 out of 10 and he had to be driven to the infirmary.  (Altman Decl. at ¶ 23).  He states that he arrived at the infirmary sometime in the morning and was forced to wait until later in the afternoon to see Dr. Krisher.  (Id. at ¶ 24).  According to Nurse McQuate's notes, he was seen by a nurse at the infirmary at 3:30 p.m.  (Doc. #37-4 at PAGEID 180).  The record contains no indication as to why Altman was not seen in the morning.

The nurse who saw Altman at the infirmary took his vital signs and noted that the pain level in his scrotum was 10 out of 10.[2]  (Doc. #37-4 at PAGEID 175).  The nurse measured Altman's scrotum and noted it to be "17 cm," though it is unclear from the record whether the measurement

---

[2]  The name of the nurse is not clear from the record, but the signature does not appear to correspond to any of the nurses already identified in this opinion and order.

was of the circumference of the scrotum or of the diameter.[3]  (Id.)  On his scrotum, the nurse observed "black, blue, red area.  Slight red discharge on back side."  (Id.)  The nurse also noted "skin color ash gray," though it is unclear if this referred to an area on Altman's scrotum or his overall appearance.  (Id.)

Dr. Krisher saw Altman at 4:10 p.m.  Dr. Krisher noted that Altman stated that his scrotum had started swelling about one week prior.  (Doc. #37-4 at PAGEID 175).  Dr. Krisher observed a "[t]ender warm scrotum [with] large scab on distal scrotum.  Testicles do not appear to be tender." (Id.)  Dr. Krisher diagnosed Altman as having cellulitis and prescribed Rocephin (an injectable antibiotic, one gram, for three days), Doxycyline (100 mg for 7 days) and Tolnaftate.[4]  (Id. at 176-78).  He further ordered that Altman be admitted to the infirmary.  (Id.)  At 4:16 p.m., Dr. Krisher signed a written prescription reflecting his orders.  (Id. at 177).  According to Altman, he told Dr. Krisher that he should be doing more to help him.  (Altman Decl. at ¶ 26).

At 11:40 p.m., a nurse checked Altman's vital signs and recorded his pain level as 8 out of 10.  (Doc. #37-4 at PAGEID 180).

**E.  April 10**

On Tuesday, April 10, Altman woke at about 8:00 a.m. with blood oozing from the skin of his scrotum.  (Altman Decl. at ¶ 27).  At 8:45 a.m., a nurse assessed him and observed a blister on his scrotum, discoloration and increased pain.  (Doc. #37-4 at PAGEID 184)  Shortly thereafter, another nurse noted increased swelling, discoloration and drainage (compared to what was observed

---

[3]  An illegible word or abbreviation follows "17 cm" in the nurse's notes.  Nurse McQuate testified that the measurement is typically taken of the circumference.  (McQuate Dep. at 58).

[4]  Defendants have set forth no evidence or materials to assist the court in understanding Dr. Krisher's diagnosis of cellulitis or his prescription of Doxycyline and Tolnaftate.  According to plaintiff's expert, Dr. R. Bruce Bracken (Urology Clinical Director at the University of Cincinnati's College of Medicine), cellulitis is an "inflammation of subcutaneous tissue," and, "as the infection picks up steam," it "causes the gangrene."  (Bracken Dep. at 45-46).  This condition, in the view of plaintiff's expert, can serve as a "precursor" to Fournier's Gangrene.  (Id. at 46).

Doxycycline is an antibiotic used to treat bacterial infections.  (Bracken Dep. at 108; Doxycycline, Medline Plus Medical Encyclopedia, a service of the U.S. Nat'l Library of Medicine and the Nat'l Institutes of Health, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682063.html).  See Wimbush v. Wyeth, 619 F.3d 632, 635 n.1 (6th Cir. 2010) (citing to Medline Plus Medical Encyclopedia).

Tolnaftate is a topical anti-fungal cream, commonly used for skin infections, "including athlete's foot, jock itch, and ringworm."  (Tolnaftate, Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682617.html).

on April 9), a pain level at 10 out of 10, and a "foul odor." (Id.)  Altman appeared pale and ashen looking. (Id. at 183).

Dr. Krisher saw Altman at 10:05 a.m. and noted that Altman said his condition had worsened. (Doc. #37-4 at PAGEID 176). Dr. Krisher recorded that the scrotum seemed to be more swollen, that the scabbed area had increased in size and that blisters had appeared. (Id.) Dr. Krisher noted a "concern for Fournier's Gangrene" and ordered at 10:18 a.m. that Altman be taken by squad to the Ohio State University Medical Center's Emergency Room. (Id. at 176, 187). On the written transfer order, Dr. Krisher noted that he found "dark, necrotic tissue on scrotum – enlarging rapidly." (Id. at 187).

Altman arrived at Ohio State at 12:48 p.m. and was examined in the ER an hour later. (Doc. #37-4 at PAGEID 188). He was then admitted to the urology department's operating room upon being diagnosed with Fournier's Gangrene at 4:44 p.m. (Id.) Altman underwent a surgical debridement to remove all of the necrotic tissue and underwent reconstructive surgery to graft skin onto his scrotum. (Id. at 195; Bracken Report at 5). He also had a catheter inserted into his urethra. (Doc. #37-4 at 195).

### F.     Post-Surgery

Altman was discharged from Ohio State to Franklin Medical Center (a facility operated by the Ohio Department of Rehabilitation and Correction) on April 27, 2012 and was returned to CCI on May 17, 2012. (Doc. #37-4 at 192, 195). Because of complications relating to urethral stricturing or scarring from the catheter, Altman later underwent a perineal urethrostomy procedure by which his urethra was redirected to exit behind the scrotum. (Doc. #37-4 at 202-205; Bracken Report at 5).

Altman was discharged from incarceration in August 2013. Altman states that he experiences constant pain and cannot sit or walk for long without pain and that he has difficulty bending and lifting. (Altman Decl. at ¶ 32-33, 37). He has extensive scarring in his genital region and is sterile. (Id. at ¶ 35). Altman is currently unable to work and receives Social Security disability benefits. (Id. at ¶ 37).

## II.     Motion for Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586

F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Discussion

### A. Elements of a Deliberate Indifference Claim

Plaintiff asserts a claim under 42 U.S.C. § 1983 for deliberate indifference to his serious medical needs. "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eight[h] Amendment's

prohibition against cruel and unusual punishment." Miller v. Calhoun Cnty., 408 F.3d 803, 812 (6th Cir. 2005) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

A deliberate indifference claim involves a mixed objective and subjective standard:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Miller, 408 F.3d at 812 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Under the objective part of the test, plaintiff must show the existence of a "sufficiently serious" medical need. "Seriousness is measured objectively, in response to 'contemporary standards of decency.'" Reilly v. Vadlamudi, 680 F.3d 617, 624 (6th Cir. 2012) (quoting Hudson v. McMillan, 503 U.S. 1, 8 (1992). "Essentially, a prisoner 'must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" Id. (quoting Farmer, 511 U.S. at 834).

Here, defendants concede that Altman had a serious medical need. (Doc. #37 at 14) ("Defendants concede that whether earlier diagnosed as testicular cellulitis, or later as Fournier's Gangrene, either of those conditions would constitute a serious medical need."). Fournier's Gangrene is a "rare" and "life-threatening urological emergency" associated with an aggressive infection of the scrotum, penis or perineum. (Bracken Rep. at 5-6). Its symptoms include severe pain, swelling, blistering, scabbing, discoloration of the dying tissue, and odor. (Id. at 5). It requires immediate, "same-day" treatment through "broad-spectrum intravenous antibiotics" and surgical debridement of any dead tissue. (Id. at 6). See also Rogers v. T.J. Samson Cmty. Hosp., 276 F.3d 228, 230 (6th Cir. 2002) (describing Fournier's Gangrene as "an aggressive, potentially deadly infection that is typically treated with serial debridements of all dead and dying tissue").

Under the subjective part of the test, plaintiff must show that the defendant acted with "a sufficiently culpable state of mind in denying medical care." Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 895 (6th Cir. 2004) (internal quotation marks omitted). In the prison context, the requisite state of mind is one of deliberate indifference to inmate health or safety. Brown v. Bargery, 207 F.3d 863, 867 (6th Cir. 2000).

"Deliberate indifference is characterized by obduracy or wantonness – it cannot be predicated on negligence, inadvertence, or good faith error." Reilly, 680 F.3d at 624 (6th Cir. 2012) (citing Whitley v. Albers, 475 U.S. 312, 319 (1986)). "[T]his standard is satisfied if 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Brown, 207 F.3d at 867 (quoting Farmer, 511 U.S. at 837). Thus, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Horn v. Madison Cnty. Fiscal Ct., 22 F.3d 653, 660 (6th Cir. 1994).

Nonetheless, a plaintiff "does not need to show that the correctional officers acted with the 'very purpose of causing harm or with knowledge that harm will result.'" Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 541 (6th Cir. 2008) (quoting Farmer, 511 U.S. at 835). The provision of "grossly inadequate medical care" to an inmate may constitute deliberate indifference in medical mistreatment cases. Miller, 408 F.3d at 819 (citing Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834, 843 (6th Cir. 2001)). "Grossly inadequate medical care is medical care that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. To ascertain whether a medical care provider rendered grossly inadequate medical care to a detainee, a court must undertake a particularized, fact-specific inquiry." Id. (internal quotation marks and citations omitted).

### B.    Summary of Arguments

Defendants argue that Altman was provided with "constant medical care and treatment" from April 6 to April 10, 2012. (Doc. #37 at 13). He was cared for by numerous nurses, whose role, according to defendants, did not include diagnosing his condition. Defendants contend that the nurses' actions were consistent with their reasonable reliance on Dr. Krisher's initial diagnosis that Altman had a urinary tract infection. Defendants further contend that the earliest point in time in which an inference could have be drawn that Altman had Fournier's Gangrene was when Dr. Krisher first noted his concern for Fournier's Gangrene on the morning to April 10. They argue that Dr. Krisher did not respond indifferently, but quickly ordered that a squad take Altman to an ER. While acknowledging that Altman has endured "certain hardships," defendants contend that their provision of "extensive" "medical care and treatment saved his life." (Id. at 3).

Plaintiff argues that his requests for medical attention pertaining to scrotal pain and swelling went ignored from the outset and continued through to the point he was seen by Dr. Krisher. He contends that he has set forth facts from which a jury could reasonably conclude that Nurses Jensen and McQuate were aware that he was suffering pain and swelling and that his condition presented symptoms beyond a urinary tract infection. Plaintiff argues that as the gatekeepers of information, Nurses Jensen and McQuate should have communicated his symptoms to Dr. Krisher. Plaintiff

further argues that on April 6 Dr. Krisher could not have reasonably believed that scrotal pain and swelling were symptoms of a urinary tract infection and that on April 9 Dr. Krisher acted with deliberate indifference to clear signs of gangrene when he merely prescribed an antibiotic and antifungal cream.

### C.  Nurse Jensen

Nurse Jensen had a single point of contact with Altman.  She assessed Altman at the infirmary at 7:40 p.m. on Friday, April 6.  In defendants' view, Altman made no complaint to Nurse Jensen about pain or swelling in his groin or scrotum.  Rather, they contend that she was only aware of him having difficulty urinating and that she properly responded by performing a urine dipstick test.  Defendants argue that Nurse Jensen accurately conveyed this information to Dr. Krisher when she called him and that she accurately memorialized and complied with Dr. Krisher's orders (those orders being that Altman be put on an IV and prescribed Cipro and that he be called if Altman's condition did not improve).

Defendants' argument overlooks the evidence which supports an inference that Nurse Jensen knew Altman was complaining of more than difficulty in urinating.  In his declaration, Altman states that he told her "about the terrible pain and swelling in my testicles," "told her about everything in [his] health services request" and "emphasize[d] that the swelling was bad and that [his] testicles felt like they were burning."  (Altman Decl. at ¶ 7).  Further, though Nurse Jensen could not recall Altman complaining of any genital pain or swelling, she testified that she commonly reviews a patient's medical record before seeing the patient.  It is undisputed that Altman complained in his Health Services Request of having pain and swelling in his groin and complained that the symptoms were getting worse.

Defendants contend that Nurse Jensen could not have acted with deliberate indifference because ultimately it was not her role to make a diagnosis or prescribe a course of medical treatment.  The court, however, finds ample legal authority establishing that so-called gatekeepers to treating physicians can themselves be liable if they delay or refuse in performing their gatekeeper role.  See Terrance, 286 F.3d at 846 (holding that prison nurse could be held liable for failing to "immediately seek alternate medical assistance"); Jones v. Muskegon Cnty., 625 F.3d 935, 943-44 (6th Cir. 2010) (holding that prison nurses could be held liable for causing an extended delay before inmate could be examined by doctor); cf. Reilly, 680 F.3d at 626 (recognizing viability of claim against prison nurse for alleged failure to refer inmate to a capable medical professional for evaluation, but finding that evidence demonstrated that the nurse had in fact made a "good-faith referral").  If a member of

a prison's medical staff knows that his role in a particular medical situation is "to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care." Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000); accord Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005); Turman v. Hawley, 40 Fed. App'x 284, 287 (7th Cir. 2002) (stating that non-treating physicians can be held liable for "knowingly denying or delaying access to necessary treatment for a serious medical condition"); Nelson v. Hill, No. 3:08CV603, 2010 WL 1005320, at *3 (E.D. Va. Mar. 17, 2010) ("A prison official who serves as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role.") (internal quotation marks omitted).

Here, Nurse Jensen's role as a gatekeeper was one that she understood. She knew that CCI doctors were not present at the institution outside of regular weekday business hours. (Jensen Dep. at 26). She assessed Altman at 7:40 p.m. on Friday, April 6, and a jury could certainly find that she must have appreciated that a doctor would not personally examine Altman until the following Monday (outside of Altman being transported to an emergency room). (Jensen Dep. at 26, 28-29). It was her role to telephone an on-call doctor (in this case Dr. Krisher), who relied on her to accurately describe Altman's symptoms to him.

A jury could further find that Nurse Jensen refused to serve her gatekeeper role. Crediting Altman's statements, a jury could find that he told her that he was experiencing significant and increasing pain and swelling in either his scrotum or testicles. It is undisputed that Nurse Jensen did not conduct a visualization of Altman's scrotum and that she did not inform Dr. Krisher of these symptoms. The pain and swelling of which Altman complained was of such a serious nature that the court believes a jury could reasonably find that Nurse Jensen should have communicated this information to Dr. Krisher so that he could make an informed diagnosis. See Tracy v. Hay, 946 F.2d 896, 1991 WL 206504 at *2 (6th Cir. 1991) (prison official must not prevent diagnosis and treatment by medical professional "where the circumstances are clearly sufficient to indicate the need for medical attention") (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)); Blackmore, 390 F.3d at 898 (a sufficiently serious medical condition is one "that laymen would readily discern as requiring prompt medical attention by competent health care providers").

**D.      Nurse McQuate**

Nurse McQuate saw Altman at 9:15 p.m. on Sunday, April 8.  She was called to his dorm area on an emergency basis.  Altman complained of scrotal or testicular pain and reported his pain level as being 8 out of 10.  Nurse McQuate examined him and observed that his scrotum was swollen.  According to Nurse McQuate, she gave him Tylenol and advised him to rest and see the doctor the next day.  It is uncontroverted that she did not call a doctor that evening.  According to Altman, Nurse McQuate gave him a cursory exam, did not give him any medicine and told him that there was nothing she could do for him.

A jury, crediting Altman's version of events, could find that Nurse McQuate knew that he was experiencing significant pain and swelling in either his scrotum or testicles.  A jury could also find that she understood that the pain had worsened, as the nurses' records for Altman showed a last recorded pain level of 5 out of 10 at 11:00 p.m. on April 6.  (McQuate Dep. at 13) (testifying that when she goes to a dorm to check on an inmate on an urgent basis, she reviews the inmate's medical records once she returns to the infirmary).  The record would also support a finding that Nurse McQuate, who was called to the dorm area to see Altman, appreciated that he was too unwell to make it on his own to the infirmary to receive the medication (Cipro) that Dr. Krisher had prescribed for him.  (Doc. #37-4 at PAGEID 169) (medication administration record showing that Altman had not shown to receive Cipro on April 7 and 8).

The court further concludes that a jury could find that Nurse McQuate acted with deliberate indifference to Altman's medical needs.  As a gatekeeper, she had several potential ways to respond to what was presented to her as an urgent and worsening medical condition (if one view the facts in a light most favorable to plaintiff).  She could have called a doctor.  Dr. Krisher's most recent order, which was reflected in the nurses' notes from 11:00 p.m. on April 6, was that he be called if Altman's symptoms persisted.  At 9:15 p.m. on April 8, Nurse McQuate knew that the symptoms had persisted yet she did not call Dr. Krisher.  She could also have had Altman taken to the infirmary, where he could have received the Cipro that Dr. Krisher had prescribed for him.  (McQuate Dep. at 17) (testifying that nurses could have an inmate taken to the infirmary for a limited time without a doctor's order).  This order too was in Altman's records (Doc. #37-4 at PAGEID 166, 169), but Nurse McQuate did not have him taken to the infirmary or otherwise arrange for him to receive his medicine.

Nurse McQuate opted to advise Altman to rest and come back to see a doctor.  Defendants argue that Nurse McQuate acted reasonably in deferring to take any action because she was aware

that Altman had a pass to see Dr. Krisher the next day, or even the next morning (if one credits her testimony). The court recognizes that a jury could be persuaded by this argument and find that Nurse McQuate was not deliberately indifferent to Altman's needs. However, the court believes that a jury could reasonably reach the opposite conclusion – that Altman's urgent and serious condition required that she take immediate action in the form of calling Dr. Krisher or ensuring that he received his prescribed medication.

### E.     Dr. Krisher

#### 1.     April 6

Plaintiff argues that Dr. Krisher first acted with deliberate indifference to Altman's medical needs on the evening of April 6 when he allegedly misdiagnosed Altman's condition as a urinary tract infection. Plaintiff contends that it is obvious that scrotal pain and swelling are not symptoms of a urinary tract infection, but "were indicative of life-threatening condition." (Doc. #45 at 18).

The court disagrees. It is undisputed that when Dr. Krisher was first contacted about Altman (by Nurse Jensen shortly after 7:40 p.m. on April 6), he was not informed of Altman's complaint of pain and swelling in his scrotum. Nurse Jensen informed him only of Altman having difficulty urinating and of the results of the urine dipstick test, which indicated a high level of white blood cells. Plaintiff has not contested defendants' assertion that the results of the urine dipstick test reasonably supported a provisional diagnosis of a urinary tract infection. (Jensen Dep. at 41-42).

Dr. Krisher was next contacted about 3 hours later by Nurse Clark, who informed him that Altman's pain had decreased but that he had a swollen scrotum. Though the court agrees with plaintiff that scrotal pain and swelling are serious symptoms, the court does not agree that Dr. Krisher must have drawn the inference that Altman was facing a life-threatening condition and that Dr. Krisher should have ensured Altman received immediate treatment beyond what he had already ordered (Cipro, Rocephin and an IV). According to Dr. Bracken, plaintiff's expert, Fournier's Gangrene is indicated by progressive, worsening symptoms, including pain, swelling, blistering, scabbing, discoloration and a foul odor. (Bracken Rep. at 5). As of 11:00 p.m. on April 6, Dr. Krisher was aware only of scrotal pain and swelling, and the only progression reported to him was that the pain had decreased from a level of 8 out of 10 to a level of 5 out of 10.

In light of the information made known to Dr. Krisher, the court finds as a matter of law that Dr. Krisher did not act with deliberate indifference to Altman's medical needs on April 6. He ordered that Altman receive two forms of antibiotics, as well as an IV. Importantly, Dr. Krisher charged Nurse Clark with this instruction: that Altman be given a pass to see a nurse in the morning

and that Dr. Krisher be called if the symptoms persisted.  Nurse Clark recorded that Altman was given a pass to be seen at 8:00 a.m. on April 7 and have his scrotum checked.  Thus, Dr. Krisher arranged for a nurse to assess the progression of Altman's symptoms a mere nine hours later, following the administration of the first round of medications.  And Dr. Krisher ordered that he be contacted if Altman's condition did not change.  Thus, Dr. Krisher's response to Altman's condition on April 6 was not characterized by obduracy or wantonness, nor can it be said that the treatment which Dr. Krisher ordered for Altman to receive was grossly inadequate at the time Dr. Krisher made his order.

2.     **April 9**

The court reaches a different conclusion as to Dr. Krisher's care of Altman on April 9.  By the time Dr. Krisher saw Altman on that day, Altman's condition had substantially worsened.  His pain level reached 10 out of 10, the swelling had increased, he appeared "ash gray," and areas of black, blue and red had emerged on his scrotum, as had a spot of "red drainage."  Dr. Krisher observed a "large scab" on Altman's scrotum, and Altman told Dr. Krisher that he first began experiencing symptoms on April 4 or 5.

Defendants argue that Dr. Krisher's diagnosis of cellulitis was a reasonable one. Plaintiff and his expert do not necessarily disagree.  According to Dr. Bracken, the appearance of cellulitis can be a precursor to Fournier's Gangrene, which underscores the importance of the patient receiving aggressive antibiotics to thwart the further development of Fournier's Gangrene.  This was particularly so here, with symptoms of gangrene – a black area and red drainage (Bracken Dep. at 88) – already having manifested on Altman's scrotum.  A jury could reasonably find from the evidence of what Dr. Krisher knew and observed of Altman's symptoms and that he drew the inference that Altman faced a threatening and serious medical condition.

A jury could further find that Dr. Krisher acted with deliberate indifference in responding to Altman's condition.  The record indicates that Dr. Krisher allotted a mere six minutes, from 4:10 p.m. to 4:16 p.m. to see Altman.  He prescribed one gram of Rocephin, an antibiotic and dosage amount that Dr. Bracken described as being woefully inadequate for the situation.  (Bracken Dep. at 67).  Moreover, Dr. Krisher had already ordered that one gram of Rocephin be administered to Altman on April 6, and he would have appreciated that Altman's condition had worsened substantially since that point.  Dr. Krisher further prescribed a topical anti-fungal cream that, in light of its common use to treat jock itch, a jury could find reasonably conclude was likewise grossly

inadequate for the serious symptoms Altman was experiencing, which at a minimum Dr. Krisher realized to be cellulitis, a subcutaneous infection.[5]

Defendants stress that the lack of wantonness on Dr. Krisher's part is proved by his response on April 10. According to defendants, the moment Dr. Krisher first drew the inference that Altman could have Fournier's Gangrene, he ordered Altman to be taken by squad to the ER. A jury might ultimately agree, but the court finds that the evidence would also support a reasonable finding that on April 9 Dr. Krisher was presented with facts regarding Altman symptoms that would have made him appreciate the seriousness of Altman's condition (even if those symptoms did not yet conclusively point to Fournier's Gangrene) and that he acted with deliberate indifference in treating him jock-itch cream and an antibiotic that had already been proved to be ineffective.

### F.  Qualified Immunity

Plaintiff has sued the defendants in their individual capacities and seeks monetary relief. The defense of qualified immunity may be asserted by government officials sued in their individual capacities. Guest v. Leis, 255 F.3d 325, 337 (6th Cir. 2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This defense shields government officials from liability if their official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818.

The issue of qualified immunity involves a two-step analysis. First, plaintiff must demonstrate the violation of a constitutionally protected right. Guest, 255 F.3d at 332 (citing Brennan v. Township of Northville, 78 F.3d 1152, 1154 (6th Cir. 1996)). Second, the court must examine "whether the right is so clearly established that a reasonable official would understand that what he is doing violates that right." Id. (internal quotation marks omitted); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987). The "clearly established" standard is evaluated with reference to binding precedent by the United States Supreme Court, the court of appeals or the district court itself. Fisher v. Harden, 398 F.3d 837, 845-46 (6th Cir. 2005).

Defendants' argument in support of qualified immunity is conclusory at best. They argue, "There is no greater example of a discretionary acts [sic] performed by state officials [than] when an experienced and licensed physician, and registered nurses collaborate in an effort to arrive at a medical decision that draws upon their best individual and collective medical judgement . . . . As a

---

[5]  Dr. Krisher additionally prescribed the antibiotic Doxycycline, but, as noted above in footnote 4, defendants have set forth no evidence concerning this medication in support of their motion for summary judgment.

result, Mr. Altman will be unable to point the Court to any firmly established precedent" mandating that he should have received care different from what defendants provided to him.  (Doc. #37 at 21-22).

The court recognizes that its role is not to second-guess each decision a medical professional makes in the prison setting.  But the law already implements this principle by setting the standard of liability so high – medical malpractice does not suffice; the law requires deliberate indifference amounting to unnecessary and wanton infliction of pain.  Defendants' argument is not a valid theory for why qualified immunity should apply here.  Rather, it is an argument in support of why the liability standard should be high in the first place.

For the reasons already discussed, the court finds that plaintiff has met his burden of establishing that a jury could reasonably find that each defendant violated his constitutional right against cruel and unusual punishment.  The court further finds that plaintiff's rights were clearly established.  The Supreme Court and Sixth Circuit have directly held that treating physicians in a prison are liable if they act with deliberate indifference to an inmate's serious medical needs.  See Estelle, 429 U.S. at 104, 107 (expressly referencing "prison doctors" and a "treating physician"); Miller, 408 F.3d at 819 (stating that "a doctor's provision of grossly inadequate medical care to an involuntary detainee may amount to deliberate indifference") (internal quotation marks omitted).

Further, binding precedent clearly establishes that nurses can be held liable if they delay or refuse access to necessary treatment for a serious medical condition.  While the Sixth Circuit has not used the term "gatekeeper," as some courts have, this legal principle flows directly from Estelle, wherein the Supreme Court held that liability encompasses not only doctors but also prison guards who intentionally deny or delay access to medical care.  Estelle, 429 U.S. at 104-05.  Thus, the Sixth Circuit has long held that liability extends to *any* prison official, including a nurse, who prevents an inmate from "being diagnosed and treated by qualified professionals . . . where the circumstances are clearly sufficient to indicate the need for medical attention."  Tracy, 1991 WL 206504 at *2 (citing Westlake, 537 F.2d at 860).  See also Reilly, 680 F.3d at 626; Jones, 625 F.3d at 943-44; Miller, 408 F.3d at 812-13; Terrance, 286 F.3d at 846.  This court too has followed this legal principle.  See, e.g., Wright v. Cnty. of Franklin, Ohio, 881 F. Supp. 2d 887, 903-06 (S.D. Ohio 2012) (holding that prison nurses could be held liable for failing to call a doctor when inmate complained of abdominal pain and throwing up blood).

### G.      Summary

The court therefore finds that defendants' motion for summary judgment must be denied as to plaintiff's claims against Nurse Jensen for her conduct on April 6, 2012, Nurse McQuate for her conduct on April 8 and Dr. Krisher for his conduct on April 9.  The motion is granted as to plaintiff's claim against Dr. Krisher for his conduct on April 6 and as to plaintiff's claims relating to defendants' alleged post-surgery conduct.

## IV.      Motion for Adverse Inferences

The court now turns to plaintiff's motion for adverse inferences.  Dr. Krisher has been diagnosed with amyotrophic lateral sclerosis (ALS, or Lou Gehrig's Disease).  With counsel for both sides knowing of Dr. Krisher's diagnosis, they failed take any affirmative measures to preserve his knowledge and recollection of the events from April 6 to April 10, 2012 until the disease had rendered Dr. Krisher unable to communicate.

The briefs relating to plaintiff's motion are replete with blame-shifting.  The court finds that counsel for both sides share in the blame, as the following recitation of events will make clear.

### A.      Background

The complaint was filed on April 8, 2014.  The court's July 16, 2014 preliminary pretrial order set a discovery deadline of March 31, 2015.  Defendants concede that attorney Thomas Anger, former legal counsel for defendants, knew no later than December 23, 2014 that Dr. Krisher had been diagnosed with ALS.  (Doc. #51 at 4).  And according to Anger's affidavit, when he first learned of Dr. Krisher's condition, he was informed that Dr. Krisher "had been diagnosed with the illness for some time."  (Anger Aff. at ¶ 5).  Further, Anger understood that ALS is "degenerative, incurable, and ultimately leaves its victims unable to move or communicate."  (Id.)

As he should have, Anger informed plaintiff's counsel, David Singleton, of Dr. Krisher's condition "very shortly" after he learned of it.[6]  (Anger Aff. at ¶ 6).  However, with both sides aware

---

[6]  On this point, the court is relying on the representation of defense counsel and Anger's affidavit. There is no corroborating evidence to show exactly when Anger informed Singleton of Dr. Krisher's condition.  That being said, plaintiff's reply brief does not dispute Anger's affidavit.  An email sent by Singleton to Anger on April 27, 2015 shows that Singleton had known of Dr. Krisher's condition. (Doc. #51-1 at PAGEID 1013) (referring to the "doctor's condition").

The court interprets "very shortly" to mean that Anger informed Singleton within days or perhaps a few weeks after he learned of Dr. Krisher's condition.  Should the court become aware of facts

for about three months before the discovery deadline that Dr. Krisher had "for some time" been diagnosed with a progressive neurodegenerative disease, no one initiated any effort to preserve Dr. Krisher's knowledge of the events at issue. And, regrettably, counsel kept the matter secret from the court for many months.

The discovery deadline passed without the parties taking any discovery of Dr. Krisher. Defense counsel pins the blame on plaintiff for never having formally or informally attempted to depose Dr. Krisher. Plaintiff's counsel responds that he was holding off scheduling a deposition because, upon being told by defense counsel that Dr. Krisher would be serving as a rebuttal expert, plaintiff's counsel wanted to wait until he received Dr. Krisher's expert report so that Dr. Krisher would have to endure just one deposition.

The court finds these arguments to reflect little more than shortsighted gamesmanship. Both sides certainly appreciated that the knowledge and actions of Dr. Krisher were at the heart of this lawsuit. A fair and just determination of the case demanded that the evidence pertaining to Dr. Krisher be considered in the adjudication of plaintiff's claims. See Fed. R. Civ. P. 1 (providing that the court and the parties must administer the rules "to secure the just . . . determination of every action"). Even in the absence of plaintiff requesting a deposition, defense counsel surely realized that Dr. Krisher's condition meant that the evidence he had to offer would soon be lost, and counsel should have recognized that he should have immediately taken steps, preferably with the court's guidance, to preserve that evidence for the summary judgment and trial phases of the case. And plaintiff's counsel should have viewed with skepticism defense counsel's claim that Dr. Krisher would be serving as an expert – a nearly incredible claim in light of his physical condition and his status as a party to the suit. See Tagatz v. Marquette Univ., 861 F.2d 1040, 1042 (7th Cir. 1988) (calling it "remarkable" that a party would purport to serve as his own expert witness and holding that the "trier of fact should be able to discount for so obvious a conflict of interest"). The fact testimony Dr. Krisher could have offered was far more valuable to the resolution of this case than any opinion evidence he could have given, and plaintiff's counsel should have sought without delay to preserve such fact testimony.

The missteps continued after the discovery deadline passed. On April 30, 2015, the parties jointly moved to extend the discovery deadline. They noted that Dr. Krisher had been diagnosed with ALS and that he could not work for long periods of time, yet counsel assured the court that a

---

demonstrating that Anger waited a month or more to inform plaintiff's counsel that Dr. Krisher had for some time been diagnosed with ALS, the court may reevaluate this matter.

deposition would occur "in short order." (Doc. #17 at PAGEID 70). The record now shows that Anger already had reason to doubt the assurance he gave to the court and opposing counsel. Anger had exchanged emails with Dr. Krisher on April 9 about setting up a time to talk by telephone about Altman's medical records. Dr. Krisher stated that he was best able to speak in the mornings. (Doc. #51-2 at PAGEID 1014). Anger called him on the morning of April 13 and spoke to him for about one hour:

> Dr. Krisher had difficulty speaking, and towards the last half of the conversation, Dr. Krisher had noticeable difficulties particularly with annunciating his words and sentences. Though all of Plaintiff's pertinent medical records were sent to him, Dr. Krisher and I only had the opportunity to discuss Plaintiff's pre-surgical medical records. At the end of that part of his review of Plaintiff's care, Dr. Krisher was too taxed to continue. We agreed to continue our conversation at a later date . . . but that conversation never materialized.

Anger Aff. at ¶ 15.

Without being told of the full extent of Dr. Krisher's decline, the magistrate judge extended the discovery deadline to August 21, 2015.

During this extended discovery period, counsel accomplished nothing. On July 13, 2015, Anger sent an email to Singleton suggesting that they "figure out how and when" plaintiff would depose Dr. Krisher. (Doc. #51-4 at PAGEID 1024). Singleton responded that his co-counsel, Sasha Appatova was "now back on [the] case. She will reach out." (Id.)

On August 21, at the close of the discovery period, Appatova delivered interrogatories for Dr. Krisher to defense counsel. (Appatova Decl. at ¶ 5). On August 24, Anger emailed Dr. Krisher, not about the interrogatories, but saying that Singleton "will want to depose you at some point. I will be leaving this section on 10/2. It would be best if we could meet before then." (Doc. #51-3 at PAGEID 1021). Dr. Krisher responded, "Okay but I am not in good shape. I can still speak but for a short time." (Id.)

The case was set for mediation in September 2015 as part of the court's mediation program. But when the assigned mediator informed the magistrate judge that neither party had provided the required exchange of settlement positions, the magistrate judge immediately held a status conference with the parties on September 8, 2015. This conference revealed that the parties had failed to meet the August 21 discovery deadline and that Dr. Krisher was no longer able to withstand the rigors of a deposition. The magistrate judge ordered that "plaintiff will propound, by September 16, 2015, written interrogatories to this defendant in lieu of deposition." (Doc. #20 at 1).

The missteps continued to mount. Despite having already prepared interrogatories in August, plaintiff's counsel failed to meet the September 16 deadline. Apparently believing that she and Anger had worked out some alternative arrangement to what the magistrate judge had plainly ordered, Appatova emailed Anger on September 23 with what she styled as "deposition questions to Dr. Gary Krisher." (Doc. #44-8 at PAGEID 408-10, Doc. #44-9 at PAGEID 411). Counsel's one week delay in meeting the court's deadline was particularly ill-advised because Anger had warned Appatova that he (the lone link of communication with Dr. Krisher) would be in a jury trial from September 28 to October 1 and would be leaving the Ohio Attorney General's Corrections Litigation Unit at the beginning of October. (Doc. #44-8 at PAGEID 409).

Plaintiff's September 23 written questions went unanswered. Anger left the Attorney General's Corrections Litigation Unit on Monday, October 5, 2015, and Assistant State Attorney Generals Segev Phillips and Thomas Miller were assigned to the case on Friday, October 9. (Anger Aff. at ¶¶ 29-30) Although this transition does not fully justify defense counsel's neglect of the written questions, it is not surprising that the neglect occurred.

On October 13, Appatova emailed Phillips and Miller, advising that she had not received a response to the written questions. (Doc. #44-10 at PAGEID 415). An hour later, Phillips responded, "Krisher is very hard to get ahold of (as you can imagine, he's got bigger issues to deal with than a case where even your expert basically said he did nothing wrong)." (Doc. #44-10 at PAGEID 416).

On the next day, Appatova re-sent the written questions to Phillips, stating that "[t]hese questions are necessary for us to properly assist our client and move forward with this case." (Doc. #44-10 at PAGEID 416). On October 15, Phillips informed Appatova that he had "got word this morning that Dr. Krisher's conditioned has worsened and that he is essentially non-communicative. As such and unless his condition improves, I do not intend to burden him with the questions provided." (Doc. #44-14 at PAGEID 426).

### B. Discussion

Plaintiff's motion asks that defendants be sanctioned "by providing adverse inferences that Dr. Krisher would have answered all discovery-related questions in a light most favorable to Plaintiff." (Doc. #44 at 366). Plaintiff does not explain whether the proposed adverse inferences would apply at summary judgment, trial or both.

A district court has "broad discretion" in crafting a proper sanction to redress instances of spoliation. Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009). Sanctions may include

"dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." Id. at 652.

The fault of a party often drives the court's decision in selecting the severity of a sanction. Adkins, 554 F.3d at 652-53. "[F]ailures to produce relevant evidence fall 'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality.'" Id., 554 F.3d at 652 (quoting Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir. 1988)).

Here, counsel on both sides share in the fault for their failure to preserve Dr. Krisher's knowledge of the events. The actions of counsel have done a disservice to their respective clients, but the court cannot say at this point that one side has been prejudiced more than the other in their ability to present their case at trial. Fortunately for the jury, they will have Dr. Krisher's contemporaneous treatment notes relating to Altman, as well as the nurses' notes and testimony regarding their discussions with Krisher and the orders which he gave them. As discussed above, this evidence could reasonably support a verdict in either party's favor. The court will defer deciding how, if at all, to instruct the jury regarding Dr. Krisher's unavailability as a witness. But the court denies the present motion and must express its reservations, in light of the shared fault of the parties, about giving any adverse inference instruction that a party might propose.

The court likewise denies the motion to the extent it seeks for the court to draw adverse inferences for purposes of the motion for summary judgment. The summary judgment standard already requires the court to view the evidence and any inferences that may permissibly be drawn from the facts in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). Because the court finds that plaintiff's claim with respect to Dr. Krisher's conduct on April 9 should survive summary judgment as it is, drawing additional inferences would serve no purpose.

As to Dr. Krisher's conduct on April 6, plaintiff does not propose what specific inferences should be drawn. One of plaintiff's written discovery questions asked Dr. Krisher to identify the individuals with whom he communicated on April 6 and to state what had been communicated to him regarding Altman's symptoms. (Doc. #44-9 at 412, No. 19). However, it is undisputed that Nurse Clark told Dr. Krisher of all of the symptoms of which Altman says he complained, including scrotal pain and swelling. With Dr. Krisher having been informed of the worst of Altman's symptoms at that point in time, there are no additional inferences that would advance plaintiff's claim. Plaintiff's claim fails as a matter of law, not because Dr. Krisher lacked knowledge of

Altman's symptoms on April 6, but because no jury could reasonably find that Dr. Krisher responded in a deliberately indifferent manner.

Accordingly, the motion for adverse inferences is denied in its entirety.

**V. Conclusion**

For the reasons stated above, defendants' motion for summary judgment (Doc. #37) is granted in part and denied in part. Plaintiff's motion for adverse inferences (doc. #44) is denied.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 1, 2016